Please proceed, counsel. May it please the court, good morning. Jeff Morris, 4AK, a 13 year old child at the time of these events when she was forcibly removed and continued to be detained from her mother, Ellen Keates, who we also represent here today. I would like to reserve a couple minutes of time for the social workers who took the most extreme actions under the circumstances where those actions violated the constitutional rights of mother and daughter under the first, fourth, and fourteenth amendments. In our brief, we have discussed four sets of circumstances that each independently give rise to a constitutional violation. Today I plan to start discussing the two of those. The first of which that I'll discuss is actually those set of facts that occurred last in time, and that is when CPS unlawfully and without justification continued the detention of the daughter from her mother, who is a fit parent, and continued to detain her for four months for an unjustifiable reason. The Supreme Court long ago established under Stanley Troxell and Santusky that a state actor cannot keep a child from her fit parent. Troxell even stated that it is presumed that a fit parent acts in the best interest of her child. So just to clarify, we're here on a motion to dismiss, is that right? It was a motion to dismiss that was granted? Yes, Your Honor. So we're just looking at the allegations in the complaint, is that correct? That is correct, Your Honor. Okay, so what you're telling us is from specific, relating to specific allegations in the complaint and how those show that there's a cause of action. Correct, Your Honor. Okay. Can you identify where in the complaint we find, what are the specific allegations that rise to the level of a violation of a fourteenth and fourth amendment? So under this set of facts, the continued detention, the facts in the complaint... So just moving back in time, at the point where there was a dependency petition was submitted to the court and the complaint doesn't reflect that there was a court order issued. I assume that the court issued an order at that time. Is that, is there any violation that could be raised after the court has ordered AK into the custody of CPS? So there were two parts to your question, Your Honor, that I'd like to answer. First is whether there was a court order and I believe that there was a order making AK a temporary ward of the So it was filed May 24th and so it was sometime around May 24th it was issued. Okay. And at that point AK is still at Aurora. But as far as whether or not continued detention was lawful after that, Wallace is instructive here, as well as Santusky. So if I could start with Santusky. I thought Wallace left an open question. Wallace did not leave an open question, Your Honor. In that case where the child had been detained based on a sexual abuse allegation that a medical provider had said and there was a petition filed and they kept the children for two and a half months and then another medical provider said that report is incorrect. There is, the records show that there was no sexual abuse. And at that point the court said that the caseworker correctly immediately took action to return the child to her parent or parents in that case. That is the type of situation that did not occur here. Here when Aurora discharged the child as having only a low risk of suicide, the department had an opportunity to make a placement decision and instead of returning her to her parents, she was sent to four months of hell until she was finally removed or taken back to her mother. So Wallace says that the city says it couldn't be held liable for any detention after their removal was approved by the Juvenile Court and we leave it to the District Court on remand to determine whether there's any violation. So isn't that what happened here? The Juvenile Court issued the dependency petition and then it's an open question whether anything that after that point. Well I think there are really two parts there to the statement you just read from Wallace. One was that there was, they recognized whether there was a constitutional violation, but on top of the constitutional violation in that case, there was a Monell claim against the city. And so the remand was about whether or not the city had a policy. That is not, there's not that because it said there that the state cannot provide an alternative placement unless it can show that the parent cannot or will not provide a capable home. And was there a court order in Sandusky? I don't recall. Yeah, I'm just not sure what the the effect is of the court order. Can you talk about what happened before the court order and whether anything that happened before the court order supports the argument that the defendants here were liable under the 14th and Fourth Amendment? Yes, Your Honor. So the very first set of facts that give rise to a claim is that the caseworkers from CPS interfered with the companionship between mother and daughter at a time when daughter needed her mother the most. And what specifically are you referring to? What allegation in the complaint? The allegation in the complaint was that PCH, Phoenix Children's Hospital, had told mom that she can go home about one o'clock to one to two o'clock in the morning and that they would reassess the child again that morning around eight. Mom went home and when she called back at eight and talked to Phoenix Children's, they told her that CPS had cut off all communication of every kind between mother and daughter. There was no justification for that kind of extensive and overbroad cut off of communication. And we have that in without justification. We also have in Wallace, when they talk about the scope of the intrusion, they say that when a child is going in for medical evaluations, that child is entitled as a constitutional right to the support of a parent unless there is some showing that that parent is causing harm to the child. And that is not in existence here. And that is what we have alleged in the complaint, that mother was the support for her daughter. The daughter needed her mother for support and instead they cut off all communication when Phoenix Children's discharged her later that day and CPS took their daughter to Aurora. At Aurora, they said, again, no contact whatsoever between mother and daughter. Can I just change the focus for just a minute here from Coyley to the other participants? That's where I was. Okay, you have a group liability theory here under integral or integral participation. I want to know a little bit about your allegations in the complaint there. Have you adequately pled integral participation such that it can survive, uh, dismissal in this case? And let's start with Gomez and Jenkins. As far as I can tell, there are no facts alleged in the complaint other than that they were working in CPS around the time that the violations occurred. No other facts. How can that possibly give rise to liability, individual liability under an integral participation theory? Thank you, Your Honor. And I'll start with your question first. It's a little more specific than if I may go to Judge Smith. So, uh, for Jenkins and Gomez, we have alleged that they were participants in the decisions that occurred. Um, as far as the timing of when that happens, um, that really occurs later in the case. And in that is it's exactly making the decisions for the continued detention. We just know that some, that there's a group of CPS caseworkers who are making those decisions and preventing daughter from returning home. Uh, those could have, you could have taken the approach of having John Doe and Jane Doe defendants in that instance, but you've, you've alleged individual liability for specific people. What's, what's the allegation with respect to secondarily, with respect to Vanessie, Lynch and Roundtree, who all they were, as I can understand it, were dispatchers who fielded phone calls? Well, you're correct that in, for, for Gomez and Jenkins, there is not a statement in the complaint like we have for Lynch, Roundtree and, um, uh, and Vanessie. Um, for, for those folks, uh, they were part of the CPS team that was working that night when they cut off communication. We don't know who it was from CPS that made the statement to Phoenix Children's to cut off all communication. And they have acknowledged that those people, they were active in the case. Uh, but we have alleged enough on these facts in this posture to get to discovery, to determine what it is that they have done. We've run away from Gomez and Jenkins and focused instead on these other three. But I don't see how any of these five, uh, under the integral participation theory, uh, are they in the same position as the, all the police officers who were all participants in the challenge search and knew that the flash bomb was going to be used. Uh, they're not in the same position. They weren't watching. They're watching. Uh, you just don't know if they had any involvement. And with Gomez and, and Jenkins, you have zero allegations. And the case law, I think, requires involvement in some meaningful way. What's the meaningful way that these five individuals were involved so that they should go through the burden of an individual liability case? Well, Your Honor, and I would like to answer your question and then reserve some time if I may. Yeah, that's fine. And that is, um, for, for Gomez and Jenkins, um, we have alleged sufficiently to, to nudge them from the conceivable to the plausible that they were working on the case and making decisions when these constitutional violations occurred. And the nature of the constitutional violations is that they're decisions. Unlike cases where it was throwing a some physical action. These are decisions. So I thought that you said that in paragraph 66, that Lynch and Roundtree collaborated in the issuance of the temporary custody notice and Kim Pender was a supervisor for Coley and, and approved it. That is correct. For, uh, the allegations concerning the initial interference by CPS, the initial contact was as in the records, and we have Vanessa, Roundtree, and Lynch. And then when the temporary order was issued or the temporary custody notice, we have also alleged that, uh, those individuals also participated in the, uh, decision to issue a, uh, warrantless temporary custody notice. And that's without a court, any court, uh, intervention. Is that correct? That's just done by the, uh, CPS? That is correct, Your Honor. And then that's what put AK into the custody of, uh, Mr. Coley, who, uh, yeah, Mr., Mr. Coley, who then transported her on a gurney to Aurora. Is that, that's not, that was how I read the complaint. That is correct, Your Honor. And if I may reserve the remaining time. We're going to, we'll let you have additional time. We'll take you back to three minutes when we get there because we were asking questions. Thank you, Your Honor. Okay. Let's hear the government. Good morning. May it please the court. James Bowen for the defendant's appellees. Uh, just to take off from where counsel began his argument, this continuing, um, dependency action, as the court pointed out, here's what happened. Uh, we went down, we removed and what we believe was an emergency in the fact support, an emergency situation, removed the child. Um, then under our statutory scheme, we must within 72 hours of that file petition with the court, which was filed approximately May 25th. You're probably going to get to this, but I want you to know that's important to me that you do get to the fact that whether Mr. Coley, I guess you are pronouncing his name, did an adequate investigation into whether there really was an emergency. That seems the whole thing seems to hang on that in your honor. Okay, then I'll get to that. But let me just finish this one thought. At my age, I forget quickly, but in any event, once the court got involved in this, uh, uh, the panel pointed out, once the court gets involved, um, we have 72 hours to file the petition. The court then under Arizona's statutory scheme has between seven to five days to hear, have this preliminary hearing. At that hearing, the court, one, advises the parents that they have a right to counsel and counsel is appointed to them if they don't afford it. They have a right at the preliminary hearing process to give any relevant testimony. So the position is all these things are saying that we withheld or may have withheld from the court. They could and did, I assume, present that. Well, we're here just on a motion to dismiss, correct? So, I mean, we're just looking at the allegations of the complaint. And taking those allegations in the light most favorable, um, to the complaint, um, is, is that enough to make it plausible that there was a constitutional violation? I mean, we're not looking at other facts or we're not on summary judgment. So, so we need to stick with what supports your position that there, that the, um, the court was right based solely on the allegations in the complaint. Okay. And again, I guess the position of the State has been and continues to be, yes, at that point it was enough because at that point, frankly, the court under Arizona's statutory scheme then makes the decisions on where the child should be placed, whether it has to make a specific finding, whether or not the continued dependency of the child out of placement or out of home. That court makes that decision, not CPS any longer. The court's making that decision based on what we tell them and what the, the parents and whatever else, their attorneys might say. Well, the complaint alleges that the court made this decision based on falsehoods that were told the court, or at least misleading statements that were told the court by Mr. Coyley. Yeah. And not to get too far out of the link, let me, I'll address that issue. But let me first also answer the question as to why we got to this point. Here's what, and it's in the complaint, as you said, this is a motion to dismiss. We are stuck. And by the way, so is plaintiff stuck with the information that they pledged in their complaint. Here's what we knew, or here's what Mr. Coyley knew at that point, that AK had a history for the last six, four to six months leading up to the point that we were asked to get involved of depression. She had gone to Christ Care's clinic, which is a relatively low cost or maybe free clinic because of her depression. One of the folks noticed her in the lobby being, crying and whatnot. So she, or that individual, asked what, you know, are you okay? She said, no, I'm depressed. And after some discussion, they immediately said, you need to go to an emergency room, which is at Children's Hospital. At that point, this girl is severely suicidal or severely depressed. She had suicidal ideations that there was a report apparently coming from the Christ Care clinic that she had actually attempted suicide the previous day. That's what the Children's Hospital and what the doctors say. CPS got involved because the hospital, the Children's Hospital, said this young woman, she needs to be in an inpatient mental health facility where she can be evaluated and observed. And the mother at that point said, no, I don't believe you. She doesn't need any services. You're just trying to make money. And the hospital became extremely concerned that mom might come and remove the child from the hospital if there wasn't some way to prevent that. That's when CPS was called and they got involved. Now they had that information. It was about 11 o'clock in the morning when Mr. Coyley actually interviewed Ms. AK. And at that point, she said, well, I didn't, I'm not suicidal now. I've had depression, suicide ideation in the past, but I'm okay right now. The decision was made between Mr. Coyley and his supervisor. And after discussion with the people at the hospital there, we needed to move immediately. And so that's why we did the temporary. Why did they need to move immediately? Because the current concern, we have a child. The risk? The risk to the child was an imminent risk of serious bodily harm. She had Risk from whom? From herself. But the risk also She was in the hospital. Why couldn't they go and get a warrant? Why didn't they have time to go and get a warrant? Well, there'll be two reasons for that, Your Honor. First, Arizona does not have any type of pre-removal process in a situation like this. The way in Arizona under our statutory scheme that a CPS worker can remove a child with a court order, they have to go get a dependency, file a dependency, and then they can apply for what's called a pickup order. But Mr. Coyley and Ms. Pender did not have that process available to them and still to this day do not. Although Arizona is working on and passed legislation starting next year, they will have a process like that. But at this time, they had nothing to go to. They had no way to get a warrant. They're afraid of the child. She might harm herself. But they're afraid that the mother may lead to this because she's denying that the child has any Mother was gone at this time. Yeah. We have been in a hospital in a situation when she's the mother of the child. She comes back at any moment. We don't know when she's going to come back. She can remove that child against medical wishes at any moment. And, you know, the CPS's job, I think it's in this Court, in Baker, I believe it's Baker, where they point this poor job that the CPS type workers have. They've got to kind of balance, well, what's best for the family and what's best for the child? In this case, I think CPS, after talking to the medical professionals, getting this information, seeing that mom not only was indicating that the child wasn't in need of any help. So the hospital, I thought, according to the allegations in the complaint, the hospital told the mother that she could not have any contact with the child in this situation. This was before any temporary custody notice or anything had issued. Am I reading that wrong? Well, by the way, and this was something else that the Council had brought up about this DCS, or Child Protective Services. It's changed names, so I apologize if I keep going back and forth, but Child Protective Services at the time. Again, plaintiff has to live by the complaint. What the complaint alleges, the only thing the complaint alleges relating to that was that Ms. Keats was told by somebody, apparently, at Children's Health, that Coley had said she should not have any contact with AC as long as she's staying at Children's Hospital, which is a relatively short time, because what happened is that they made the decision to temporary custody notice. They did that. Then the little girl was transmitted that very same day, and I don't exactly, but a short time after that was transported to Aurora Hospital. There was no other allegation that anybody, Mr. Coley or anybody at CPS, ever took any other measures. I heard him argue today that once she got to Aurora that the state indicated that she wasn't having any contact with her daughter, but that's not in the complaint. That's, the complaint has that one allegation. The only other time they talk about some reference of restricting contact with the family was in their element. They have another element in here where they're claiming that we lied or gave false information to the court, and somewhere they've indicated, and I don't recall where in the amended complaint they said it, but they said something to the effect that, well, we told the court there was no restriction on mother when, in fact, we know that Mr. Coley, back on the 21st of May, told the hospital mom shouldn't have any more contact with her during the time she was there at that hospital. I'm just looking at that allegation that after the intake into ABHS, Mr. Coley instructed that Ms. Keats was not allowed to contact AK. Is that, do you question whether that refers to this subsequent period when she was at Aurora? Let me look at, I apologize. When I went through all of this, my memory, this is paragraph 72, was the only reference where they said we restricted it. But yes, my position of the record, and again, the court can read that complaint as well as I can. I'm sorry, did you say 83? Yes, the last sentence there. Again, I apologize to the court. That's what the interpretation of the court, but our position had been and continues to be that when I went through the complaint, the reference was what was going on at the hospital. This doesn't, I don't think, change that analysis. But even if it did, again, she's only at that I'm sorry, were there other questions that I haven't answered yet that I was going to? Then if you don't have any other questions, I have four minutes and 19 seconds and I'll let you guys. Any other questions? Thank you very much. Appreciate it very much. All right, counsel, we have time for rebuttal. Just a couple things, and Judge Ikuda, you identified the paragraph 83 clearly states that they cut off contact at Aurora. As was pointed out by you, Judge Bates, there was no risk of harm. She was in the hospital under suicide watch. Phoenix Children's doesn't have their kids on suicide watch committing suicide. That just doesn't happen. It's common sense. And the other thing is, they claim that mom could come pick her up, but she's following what is, albeit an unlawful order, to not go to the hospital. And yet they're going to penalize her and say that because she theoretically could, then there's an imminent risk. But recall that there are at least three and a half hours after mom has been told don't come to the hospital. She doesn't come to the hospital. Do you have any questions? I think not. We've both done a splendid job, of course, because the court has no more questions. We just request, Your Honors, that you reverse the district court's order in its entirety. Thank you. Thank you both for your argument. The case just argued is submitted. We will now hear argument in the last case of the day, which is Sanchez v. Elizondo.
judges: M. Smith, Ikuta, Bates